[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15610
Non-Argument Calendar

_____

D.C. Docket No. 0:17-cr-60165-JIC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEFFREY VALENCIA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 11, 2019)

Before ED CARNES, Chief Judge, MARCUS, and GRANT, Circuit Judges.

PER CURIAM:

Jeffrey Valencia appeals the 120-month sentence he received after pleading

guilty to one count of possession with intent to distribute heroin, in violation of 21

U.S.C. § 841(a)(1) and (b)(1)(C).

## I.

All of these facts, which we draw from Valencia's presentence investigation report, are undisputed.  In February 2017 law enforcement officers began investigating Valencia after receiving information that he was dealing heroin and methamphetamine in Broward County, Florida.  The next month the officers heard that Valencia was storing a portion of his drug supply at the house of Jeffrey Leibowitz, who owed Valencia a $20,000 drug debt.  The officers searched the stash house and found, among other things, 425 grams of Valencia's methamphetamine.  Leibowitz was arrested and admitted that he had agreed to let Valencia "store large amounts of . . . methamphetamine" at his house to pay off the debt that he owed Valencia.  Leibowitz also admitted that Valencia repeatedly directed buyers to the stash house, where Leibowitz would sell them some of those drugs.  Leibowitz further stated that he had always known Valencia to sell drugs during the approximately fifteen to twenty years that he had known Valencia.

The law enforcement officers continued investigating Valencia.  In June 2017 they developed a confidential source who had previously bought multi-ounce quantities of heroin from him.  Later that month the officers set up three controlled heroin buys by the source from the unwitting Valencia.  The sting was successful: the officers observed Valencia selling the source more than three ounces of heroin.

Valencia pleaded guilty under a written plea agreement to one count of possession with intent to distribute heroin.  As part of the agreement Valencia stipulated that Leibowitz was "operating a stash house for Valencia." (A grand jury indicted Leibowitz with possession with intent to distribute methamphetamine and heroin.)  Valencia also stipulated that he knowingly and intentionally sold heroin to the government's confidential source in June 2017.

In calculating Valencia's base offense level, the presentence investigation report used under § 1B1.3 of the United States Sentencing Guidelines the 425 grams of methamphetamine that Valencia had kept at the stash house.[1]  That methamphetamine was determined to have a purity level of at least eighty percent, so the PSR counted it as "ice" — the term the guidelines use for methamphetamine that has a purity level of at least eighty percent.  United States Sentencing Guidelines § 2D1.1, Notes to Drug Quantity Table, n.(C) (Nov. 2016).  If that methamphetamine had been less than eighty percent pure, Valencia's base offense level would have been 30.  See id. § 2D1.1(a)(5).  But because the methamphetamine was ice, Valencia's base offense level was 32.  See id. § 2D1.1(a)(4).

After a three-level reduction for Valencia's acceptance of responsibility, see id. § 3E1.1, the PSR calculated a total offense level of 29 and a criminal history

---

[1] The PSR also used, among other drugs, the heroin that Valencia was charged with possessing.  Those drugs are not at issue in this case.

3

category of VI.  That yielded an advisory guidelines range of 151 to 188 months.
The government moved for a downward departure because of Valencia's assistance
in an unrelated case.  See id. § 5K1.1.

Valencia did not object to the PSR's factfindings.  He did object to, among
other things, the PSR counting the 425 grams of methamphetamine as ice in
calculating his base offense level.  He argued that while he knew that the drugs were
methamphetamine, he did not know that they were pure enough to qualify as ice
under the guidelines.  As he put it, it was unfair for him to be "held responsible for
the ICE WITH 81% [sic] or greater purity, without the Government having to prove
by competent evidence he knew or should have known the purity level."

The district court overruled Valencia's objection and counted the
methamphetamine as ice, which left Valencia's advisory guidelines range at 151 to
188 months in prison.[2]  But the court granted the government's motion for a
downward departure and sentenced Valencia to 120 months in prison.  This is
Valencia's appeal.

## II.

We review the district court's application of § 1B1.3 only for clear error.

---

[2] The district court also found, over Valencia's objection, that he was a career offender under § 4B1.1(a) based on a 2010 federal conviction for attempt to possess with the intent to distribute oxycodone and a 1999 Florida conviction for trafficking in cocaine.  The court noted that applying § 4B1.1(a) also led to a base offense level of 32.  See § 4B1.1(b).

4

United States v. Siegelman, 786 F.3d 1322, 1332 (11th Cir. 2015).   Under that section, a district court "shall" consider all "relevant conduct" when calculating a defendant's base offense level.  U.S.S.G. § 1B1.3, (a).  Relevant conduct includes "all acts and omissions . . . that were part of the same course of conduct . . . as the offense of conviction."  Id. § 1B1.3(a)(2) (emphasis added).  That means that "types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct . . . as the count of conviction."  Id. § 1B1.3 cmt. Background.

Valencia's position is based on his insistence that he "had no knowledge" the methamphetamine had a purity level of at least eighty percent, qualifying it as ice.  But the fact that a defendant does "not know the type . . . of the drugs [does] not preclude the district court from attributing the drugs to him [under § 1B1.3] for sentencing purposes."  United States v. Alvarez-Coria, 447 F.3d 1340, 1344 (11th Cir. 2006).  "[T]hose who, acting with a deliberate anti-social purpose in mind, become involved in illegal drug transactions, assume the risk that their actions will subject them to enhanced criminal liability."  United States v. Gomez, 905 F.2d 1513, 1514–15 (11th Cir. 1990); see also Alvarez-Coria, 447 F.3d at 1344 ("[A] defendant who transports a suitcase knowing that it contains a controlled substance . . . is accountable for the controlled substance in the suitcase regardless of his knowledge or lack of knowledge of the actual type . . . of that controlled substance.") (quoting

5

U.S.S.G. § 1B1.3 cmt. n.2(A)(1) (Nov. 2004)).

Valencia's knowledge of the purity level of the methamphetamine is immaterial; it is enough that he knew that the methamphetamine was, in fact, a controlled substance.  See Alvarez-Coria, 447 F.3d at 1344; cf. United States v. Alvarado-Tizoc, 656 F.3d 740, 743 (7th Cir. 2011) ("[F]or sentencing purposes the only knowledge required is knowledge that the substance that the defendants are selling . . . is a controlled substance.").  So the district court did not err in counting the 425 grams of methamphetamine as ice under § 1B1.3.[3]

**AFFIRMED.**

---

[3] We need not address Valencia's contention that the district court erred in finding him a career offender under § 4B1.1(a).  In this case the application of either § 4B1.1(a) or § 1B1.3 leads to the same base offense level (32) and the same advisory guidelines range (151 to 188 months in prison).  The district court properly applied § 1B1.3, so any error in applying § 4B1.1(a) would be harmless.  See Fed. R. Crim. P. 52(a); see also United States v. Keene, 470 F.3d 1347, 1348 (11th Cir. 2006) ("The reason it is unnecessary for us to decide the enhancement issue is that a decision either way will not affect the outcome of this case.").